1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

E.G.,

Case No.  24-cv-03378-LJC

8

Plaintiff,

9

v.

**ORDER RESOLVING SOCIAL
SECURITY ACTION**

10

COMMISSIONER OF SOCIAL
SECURITY,

11

Defendant.

12
13

**I.      INTRODUCTION**

14

Plaintiff E.G.[1] brings this action challenging the decision of Defendant the Commissioner

15

of Social Security (the Commissioner)[2] denying E.G.'s application for disability benefits.  The

16

parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C.

17

§ 636(c) and filed briefs on the merits in accordance with the Federal Rules of Civil Procedure's

18

Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g).  For the reasons

19

discussed below, the Court finds in favor of E.G.  The Commissioner's decision is REVERSED,

20

and the case is REMANDED for further administrative proceedings consistent with this Order.

21

/ /

22

/ /

23

/ /

24

_____

25

[1] Because opinions by the Court are more widely available than other filings, and this Order
contains potentially sensitive medical information, this Order refers to the plaintiff only by her

26

initials.  This Order does not alter the degree of public access to other filings in this action
provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule

27

5-1(c)(5)(B)(i).
[2] Commissioner Frank Bisignano assumed that role while this case was pending, and is therefore

28

automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of
Civil Procedure.

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Medical and Administrative Records

E.G. alleges both physical and mental impairments.  She does not challenge the ALJ's assessment of her physical impairments, so this summary focuses on her mental impairments, which include both intellectual limitations and conditions stemming from grief and trauma after the death of her brother in 2020 and her breast cancer diagnosis in 2021.  This summary is not intended as a complete statement of the administrative record or of all relevant evidence.

E.G. was non-verbal early in elementary school, but she was later determined to be mimicking her autistic older brother.  AR at 499.  She "needed special education classes throughout school and . . . did not complete 10th grade." AR at 499.  E.G. served as her severely disabled brother's primary caretaker from the death of their mother in 2012 until her brother's death in 2020.

> She found him unconscious in his room, called 911 while her older son attempted CPR. He was taken to the hospital, found to be suffering from sepsis but unfortunately [E.G.] was not allowed to accompany him due to the pandemic. After being hospitalized for a couple of weeks, [her brother] passed away and [E.G.] struggled to come to terms with not being able to spend time with him in the hospital.

AR at 499.  E.G. has experienced depression and anxiety since her brother's death, as well as her diagnosis with breast cancer in 2021, which required a mastectomy.  She cares for one of her sons, who has schizophrenia.  *See, e.g.*, AR at 766.

In a May 31, 2021 function report, E.G. described her inability to work as follows:

> I feel weak I have no desire anything anymore, I cant contrate
> Sometimes when I trying to clear my knees lock on me and I'm
> always stress I took over of my son with Mental Illness
> Its put me in position my my problem that I'm trying to cope with

AR at 303 (sic throughout).  E.G. reported that she wakes up with her husband at 6:00 AM but goes back to sleep after he leaves.  AR at 304.  She stated that takes care of her pets and tries to walk with them outside daily, but her husband and son help feed them.  AR at 304, 306–07.  According to E.G., her grief prevents her from sleeping, but sometimes she goes so long without sleep that she would sleep all day if she could.  AR at 304.  E.G. stated that she sometimes wears

her clothes for up to a week at a time until her husband comments on them, and relies on her husband to remind her to bathe when she "ha[s] a odor" (sic).  AR at 304; *see also* AR at 305 (stating that her husband has to remind her to take care of personal needs and grooming).  E.G. reported that she and her husband usually cook together daily, and: "I used to cook lot before.  I don't like to cook anymore."  AR at 305.  She tries to do household work, but her husband helps her and reminds her about it.  AR at 305.  E.G. reported an ability to manage some financial responsibilities but not handling a savings account, and stated that she sometimes is late paying bills and requires her husband to help her.  AR at 306.  She socializes with family members.  AR at 307.  E.G. also reported difficulty concentrating and remembering instructions, requiring her to write notes to herself.  AR at 308.

E.G.'s sister-in-law provided a third party function report around the same time, generally indicating that E.G. requires assistance and reminders with most daily activities.  AR at 292–99.

In a May 18, 2022 function report, E.G. reported that her mental impairments stem in part from trauma after the 2020 death of her older brother, who suffered from severe autism and intellectual disabilities.  AR at 325.  E.G. wrote that she had previously cared for him, but she was unable to be present with him at the hospital when he died.  *See* AR at 325.  E.G. also noted that her son had been diagnosed with schizophrenia, and that her own breast cancer diagnosis and treatment contributed to her stress.  AR at 325.  As in the previous report, E.G. stated that she routinely woke up early with her husband but went back to sleep afterwards.  AR at 326.  E.G. stated that she woke up again at 8:00 to make breakfast for her disabled son and ensure that he took his medication, and then she napped before dinner.  AR at 326.  E.G. reported that she buys prepared meals instead of cooking from scratch like she used to, and that her husband and older son help her with weekly laundry and daily use of the dishwasher.  AR at 327.  She stated that she does not do yard work due to her depression and joint pain.  AR at 327.  According to E.G., she only goes out for her own and her son's doctors appointments, though she separately reported grocery shopping on weekends for an hour with her husband.  AR at 328.  E.G. also stated that she has no hobbies other than watching television, has not engaged in social activities since her brother's death and her 2021 breast cancer diagnosis, is slow to follow instructions, and does not

United States District Court
Northern District of California

1    handle stress or changes in routine well.  AR at 329–31.  E.G. again reported that she could

2    manage money, this time stating that she was able to manage a savings account.  AR at 328.

3         Dr. Sabina Correa, Psy.D., conducted a psychological evaluation in the fall of 2020

4    including a number of objective tests, and determined that E.G. "demonstrates a significant

5    cognitive impairment and has a Full Scale Intelligence Quotient (FSIQ) of 75 indicating she has

6    difficulty in keeping up with her peers in a wide variety of situations that require thinking and

7    reasoning abilities."  AR at 376.  Dr. Correa determined that E.G.'s "overall intelligence . . .

8    indicate[s] significant problems in intellectual functioning (such as learning, problem solving,

9    judgement) and adaptive functioning (activities of daily life such as communication and daily

10   living)."  AR at 381.  Another psychologist, Dr. Aparna Dixit, conducted a similar evaluation in

11   the fall of 2021 and found a similar level of overall intelligence, but assessed only limited

12   impairments in E.G.'s abilities to work and complete activities of daily living.  AR at 436–39.

13        Reports throughout the record from Kaiser psychotherapy sessions and psychiatric

14   treatment indicate that E.G. experienced moderate to severe depression and anxiety but generally

15   presented with normal attention, concentration, memory, behavior, and other indicators, except for

16   depressed and anxious mood.  *E.g.*, AR at 455, 464–65, 500–01, 517–18, 1031–32, 1314–15,

17   1401–02.  E.G. has been prescribed Lexapro for her depression and anxiety.  *See, e.g.*, AR at 450.

18        In notes from an August 26, 2022 physical examination, Dr. Zubairah Syed noted that

19   though E.G. was "under psych care for her depression issue," she did "not want to get Social

20   Security disability due to psych related reasons [but] instead wants to pursue more medical and

21   physical issues to be the cause of her disability."  AR at 887.  E.G. also told Dr. Syed she was

22   "willing to work as a caregiver for [her son] but not for any other outside people."  AR at 887.

23        A note from March 2023 indicated that E.G. was on probation, but nearing the end of it.

24   AR at 1401.

25        **B.    Administrative Hearing**

26        At a telephonic administrative hearing on July 11, 2023, E.G. testified that she lives with

27   her two sons and her husband.  AR at 43.  Her husband and older son were at work at the time of

28   the hearing.  AR at 34.

4

1    E.G. testified that her weight fluctuates because she sometimes forgets that she needs to

2    eat.  AR at 43–44.  She stated that she "believe[d]" that tenth grade was the highest level of

3    education she completed, and that she did not later obtain a G.E.D.  AR at 44.  E.G. reported that

4    she has "a lot of learning disabilities."  AR at 45.

5    E.G. stated that since her brother was hospitalized and died in 2020 during the COVID-19

6    pandemic, she has "felt very down," weak, and tired, and like she could not get out of bed.  AR at

7    46.  She had difficulty talking about it at the hearing.  AR at 46.  E.G. did not think she could now

8    work as caregiver for someone else in the way she had for her brother, because she is "very sad

9    and [needs] a lot of time to recuperate stuff."  AR at 46; *see also* AR at 52–53.

10    In response to questioning from her non-attorney representative, E.G. testified that she was

11    in special education in school.  AR at 46–47.  She stated that she had been charged with neglect of

12    brother (despite her best efforts to care for him) and was on probation as a result, which

13    contributed to her depression.  AR at 47–48.

14    E.G. testified that she sometimes cooks, "but more likely [her] husband helps [her] because

15    sometimes [she does not] feel good," specifically with respect to fatigue.  AR at 49.  She does not

16    drive as much as she used to due to blurred vision, which she said might be an effect of her

17    medication.  AR at 50.

18    After discussing physical impairments, E.G. returned to the topic of depression, stating she

19    is very emotional talking about her brother and sometimes does not want to get out of bed.  AR at

20    51.  She credited her husband with helping her to manage her depression:

21        . . . I mean, thank goodness for my husband. He helps guide me out
         of -- getting out of bed and going on and doing things.
22
         Q How many -- does he do that every day or every -- how would he
23        have to --

24        A Quite a few -- probably every day.

25    AR at 51.

26    When her representative asked who handles cleaning the house, E.G. testified that she

27    starts things but does not finish them because she "start[s] not feeling good or . . . get[s] tired and

28    . . . just go[es] to bed," and her husband will finish chores for her.  AR at 51.  E.G. stated that

United States District Court
Northern District of California

1  medication for her breast cancer also causes moodiness and other side effects.  AR at 52.

2       E.G.'s representative asked her about filing for unemployment after her alleged onset date.

3  AR at 53.  E.G. acknowledged receiving benefits, but stated that she did not think that she could

4  work at the time she filed for unemployment, even for a part time job.  AR at 53.

5       A vocational expert (VE) testified that someone with the residual functional capacity

6  (RFC) that the ALJ ultimately assessed (as discussed further below) could not perform E.G.'s past

7  work as a caregiver, but could work as a routing clerk, housekeeping cleaner, or router.  AR at 54–

8  56.  The VE testified that if that if E.G. were off task more than ten percent of the time, she would

9  not be able to perform any jobs.  AR at 57.

10     **C.    Five-Step Framework**

11         The Social Security Administration uses a five-step process to determine whether

12  claimants are entitled to disability benefits:

13         Step 1. Is the claimant presently working in a substantially gainful
       activity? If so, then the claimant is "*not disabled*" within the meaning
14         of the Social Security Act and is not entitled to disability insurance
       benefits. If the claimant is not working in a substantially gainful
15         activity, then the claimant's case cannot be resolved at step one and
       the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).
16

17         Step 2. Is the claimant's impairment severe? If not, then the claimant
       is "*not disabled*" and is not entitled to disability insurance benefits. If
18         the claimant's impairment is severe, then the claimant's case cannot
       be resolved at step two and the evaluation proceeds to step three. *See*
           20 C.F.R. § 404.1520(c).
19

20         Step 3. Does the impairment "meet or equal" one of a list of specific
       impairments described in the regulations? If so, then the claimant is
21         "*disabled*" and therefore entitled to disability insurance benefits. If
       the claimant's impairment neither meets nor equals one of the
22         impairments listed in the regulations, then the claimant's case cannot
       be resolved at step three and the evaluation proceeds to step four. *See*
23         20 C.F.R. § 404.1520(d).

24         Step 4. Is the claimant able to do any work that he or she has done in
       the past? If so, then the claimant is "*not disabled*" and is not entitled
25         to disability insurance benefits. If the claimant cannot do any work he
       or she did in the past, then the claimant's case cannot be resolved at
26         step four and the evaluation proceeds to the fifth and final step. *See*
           20 C.F.R. § 404.1520(e).

27         Step 5. Is the claimant able to do any other work? If not, then the
       claimant is "*disabled*" and therefore entitled to disability insurance
28         benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do

1    other work, then the Commissioner must establish that there are a
2    significant number of jobs in the national economy that claimant can
     do. There are two ways for the Commissioner to meet the burden of
3    showing that there is other work in "significant numbers" in the
     national economy that claimant can do: (1) by the testimony of a
4    vocational expert, or (2) by reference to the Medical–Vocational
     Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner
5    meets this burden, the claimant is "*not disabled*" and therefore not
     entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f),
6    404.1562. If the Commissioner cannot meet this burden, then the
     claimant is "*disabled*" and therefore entitled to disability benefits. *See*
     *id.*

7    *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v.*

8    *Saul*, 971 F.3d 1128, 1130 n.2 (2020).[3]  "At steps one through four, the claimant retains the burden

9    of proof; at step five, the burden shifts to the Commissioner."  *Maxwell*, 971 F.3d at 1130 n.2.

10          For Step 3 of the analysis, nearly all listed impairments related to mental health or

11   functioning incorporate a test of whether a claimant has either "extreme" limitations in one

12   category, or "marked" limitations in two categories, with respect to a claimant's abilities to:

13   (1) "Understand, remember, or apply information"; (2) "Interact with others"; (3) "Concentrate,

14   persist, or maintain pace"; and (4) "Adapt or manage oneself."  These standards are often

15   referenced as the "Paragraph B criteria."  *See* Listing 12.00(A)(2).  For some listings, that standard

16   can be substituted by a claimant showing that they meet separate "Paragraph C criteria" or other

17   listing-specific standards.  *Id.*; *see also* Listing 12.05(A).

18          **D.    The ALJ's Decision**

19          At Step 1, the ALJ determined that E.G. had not engaged in substantial gainful activity

20   since her April 21, 2020 alleged onset date.  AR at 19.

21          At Step 2, the ALJ determined that E.G. "has the following severe impairments:

22   degenerative joint disease of the bilateral knees, degenerative disc disease of the cervical spine,

23   left shoulder strain, bilateral wrist degenerative joint disease, bilateral carpal tunnel syndrome

24   ('CTS'), obesity, status post breast cancer/gene ('BRCA'), depression, intellectual disorder,

25

26   _____

27   [3] The regulatory citations in this passage apply to adjudication of Disability Insurance benefits and
     refer to an earlier version of 20 C.F.R. § 404.1520 that is substantially similar to the current
     language of that regulation.  20 C.F.R. § 416.920 sets forth materially identical steps to assess
28   disability for the purpose of Supplemental Security Income benefits, which are not at issue in this
     case.

1    anxiety disorder, and post-traumatic stress disorder ('PTSD')."  AR at 19.

2        At Step 3, the ALJ found that E.G. did not meet the requirements for any listed

3    impairment.  AR at 20.  The ALJ specifically rejected the listings 1.15 and 1.16 related to spinal

4    disorders; listing 1.18 for a major joint abnormality; and listings 12.04, 12.05, 12.06 and 12.15 for

5    mental impairments.  AR at 20–23.  For the purpose of the mental impairment listings, the ALJ

6    found that E.G. had only moderate limitations in each of the Paragraph B functional criteria, and

7    determined that E.G. also did not meet some of the other requirements for those listings.  AR at

8    21.  The ALJ noted that CTS and obesity are not listed impairments, but she determined that

9    E.G.'s CTS did not medically equal listing 11.14 for peripheral neuropathy and asserted that she

10   "fully considered obesity in the context of the overall record."  AR at 20–21.

11       For the purpose of Steps 4 and 5, the ALJ determined that E.G. had the residual functional

12   capacity (RFC) to:

13           perform light work as defined in 20 CFR 404.1567(b) except no
14           climbing ladders, ropes, or scaffolds; occasional other postural
             maneuvers such as stooping, crouching, and crawling as described in
15           the SCO; frequent reaching with the left upper extremity (dominant
             hand), frequent handling and fingering with the bilateral upper
16           extremities; simple routine tasks; occasional interaction with
             coworkers and the public; and occasional changes in the work routine
17           in a task oriented environment that does not require a specific
             production pace.

18   AR at 23.

19       In reaching that conclusion, the ALJ determined that E.G.'s "medically determinable

20   impairments could reasonably be expected to cause the alleged symptoms," but her "statements

21   concerning the intensity, persistence and limiting effects of these symptoms are not entirely

22   consistent with the medical evidence and other evidence in the record for the reasons explained in

23   [the ALJ's] decision."  AR at 24.  The ALJ did not identify specific statements that she found not

24   credible, but included the following explanation of her credibility determination more generally:

25           In particular, and for example, the claimant applied for
             unemployment and received income during the second and third
26           quarters of 2021 (9D). At the hearing, she explained that she filed for
             unemployment even though she believed she was not able to work.
27           The allegation that she is not able to work and filing for
             unemployment, which involves certifying that one is ready, willing,

28

and able to work, is not consistent with her allegation that she is physically and mentally unable to work.

In addition, the claimant gets up every day at about 5:30 am to help her husband prepare to go to work (5E/2). This daily activity of getting up early on a schedule is the same that is necessary for maintaining employment. The undersigned finds the claimant's ability to meet this schedule somewhat diminishes the consistency of the claimant's allegations of functional limitations.

Further, the claimant told sources at Kaiser she does not want to get Social Security disability due to psych related reasons and instead wants to pursue more medical and physical issues to be the cause of her disability. (13F/13). The fact that she has indicated her claim is stronger based on physical reasons diminishes the consistency of the claimant's allegations of debilitating mental limitations.

AR at 24.

After addressing medical records related to E.G.'s physical impairments at that are not at issue here, the ALJ returned to medical opinion evidence regarding E.G.'s mental impairments. The ALJ found Dr. Dixit's assessment of only mild to moderate mental impairments "well-supported" and "persuasive." AR at 28. The ALJ found Dr. Correa's assessment of "significant problems" to be vague, ambiguous, and not persuasive. AR at 29. The ALJ also found E.G.'s sister-in-law's function report "not fully consistent with the overall record evidence." AR at 30.

At Step 4, the ALJ determined that E.G. had engaged in past relevant work as a caregiver, but that she was no longer able to perform that work based on the VE's testimony. AR at 30.

At Step 5, the ALJ determined based on the VE's testimony that E.G. could work as a routing clerk, housekeeping cleaner, or router, and therefore was not disabled. AR at 31–32.

**E.    The Parties' Arguments**

**1.    E.G.'s Opening Brief**

E.G.'s opening brief asserts three grounds for reversal and remand for further administrative proceedings. Two of them relate to the ALJ's assessment of her mental impairments, and the third relates to the manner in which the ALJ formulated her RFC. E.G. does not challenge the ALJ's treatment of her physical impairments, nor does she seek a judicial finding of disability and award of benefits. *See generally* ECF No. 10.

First, E.G. argues that the ALJ did not provide clear and convincing reasons to discredit her own statements about her mental impairments, both in function reports she submitted with her

application and in her testimony at the administrative hearing. *Id.* at 6–12. E.G. disputes the ALJ's characterization and analysis of her morning routine, *id.* at 8, her responsibility for household chores, *id.* at 8–9, her receipt of unemployment benefits, *id.* at 9–10, and her desire to focus her application on physical impairments, *id.* at 10. E.G. also argues that her lack of psychiatric hospitalization is not a valid reason to discredit her testimony, and that the ALJ's reliance on E.G.'s report of good grades in high school failed to account for her special education and the fact that she did not graduate. *Id.* at 10–11. E.G. contends that reports of intact concentration and memory in her Kaiser records were not based on formal testing, which showed meaningful defects when conducted by examining psychologists. *Id.* at 12.

Second, E.G. contends that the ALJ erred in rejecting Dr. Correa's opinions. *Id.* at 12–17. In addition to some of the same arguments she asserts with respect to her own testimony, E.G. argues that Dr. Correa's assessment of "significant" limitations was not unduly vague, and that even if it were, the ALJ should have resolved any ambiguity by supplementing the record. *Id.* at 14–15. E.G. asserts that Dr. Correa's report made sufficiently clear that it addressed E.G.'s limitations specifically rather than the generic limitations of someone with borderline intellectual functioning, contrary to the ALJ's finding of ambiguity on that subject. *Id.* at 15. E.G. further argues that ALJ's analysis impermissibly focused solely on aspects of Dr. Correa's reports that weighed against her conclusions without addressing the evidence that supported it, and that the ALJ overstated the sophistication of E.G.'s emails with her medical providers and failed to account for reasons why those emails might not reflect E.G.'s true capabilities. *Id.* at 15–17.

Finally, E.G. asserts that the ALJ's restriction that E.G. could not perform jobs that "require a specific production pace" was impermissibly vague, citing Fourth Circuit authority rejecting RFCs that included similar phrases. *Id.* at 17–20. E.G. contends that the jobs the VE identified as suitable—housekeeper, router, and routing clerk—seem to require a pace that she would be unable to meet. *Id.* at 19.

### 2.      The Commissioner's Brief

Beginning with the ALJ's use of the phrase "production pace," the Commissioner contends that the Ninth Circuit has affirmed decisions that included similar language in RFCs. ECF No. 14

10

United States District Court
Northern District of California

at 4–6.

The Commissioner argues that the ALJ "adequately analyzed Plaintiff's subjective complaints relating to her mental health." *Id.* at 8. The Commissioner notes E.G.'s reports of good grades in high school, managing her own grooming, completing household chores, and getting around by driving and using public transportation. *Id.* The Commissioner also cites the ALJ's reliance on E.G.'s performance at some of her consultative examinations and the Kaiser mental status examination notes. *Id.* The Commissioner argues that the ALJ properly construed E.G.'s statement to her doctors that she intended to focus her application on physical rather than mental impairments as "affirmative evidence of malingering," and asserts that the capacity to make such a plan itself suggests her mental impairments were not particularly severe. *Id.* at 8–9. The Commissioner further contends that the ALJ reasonably relied on E.G.'s early morning routine as evincing an ability to wake up for work, and that the Court should not second-guess the ALJ's interpretation of that testimony. *Id.* at 9. In response to E.G.'s arguments that her family members helped her with housework, the Commissioner argues that because E.G. "testified that her older son and husband work . . . it is unclear how helpful they are during the majority of the day." *Id.* The Commissioner also contends that the Ninth Circuit has recognized that applying for unemployment benefits can undermine a claim of disability, and the ALJ therefore did not err in citing the receipt of such benefits as inconsistent with E.G.'s testimony. *Id.* at 10.

The Commissioner argues that the ALJ gave sufficient reasons for finding Dr. Correa's opinions unpersuasive as compared to contradictory assessments from other medical providers, particularly under the no-longer-deferential standard of the current regulations pertaining to medical opinion evidence. *Id.* at 10–14.

Portions of the Commissioner's brief also argue that the ALJ properly assessed E.G.'s physical impairments, even though E.G. did not challenge those findings in her brief. This Order need not address those arguments.

### 3.    E.G.'s Reply

E.G. argues in her reply brief that she should not be faulted for telling her doctor that she intended to pursue her disability application based on physical rather than mental impairments,

because she "simply believed that evidence of her breast cancer and other physical impairments might give her a better chance at getting disability where she was previously denied based on her mental impairments." ECF No. 15 at 2. She contends that caselaw the Commissioner cites affirming RFCs that involved terms like "production pace" did not address any challenge to such language. *Id.* at 3. She otherwise rests on the arguments presented in her opening brief. *See generally id.*

## III.     LEGAL STANDARD

In cases challenging the denial of disability benefits, district courts have authority to review and "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence," which "'means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). A court must consider evidence both supporting and detracting from the Commissioner's decision; if the evidence could reasonably support either outcome, the court may not substitute its judgment for that of the ALJ. *Id.* at 1010. Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Id.*

## IV.     ANALYSIS

### A.     E.G.'s Symptom Testimony

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison*, 759 F.3d at 1014–15). If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for

United States District Court
Northern District of California

1  doing so.  This is not an easy requirement to meet: The clear and convincing standard is the most

2  demanding required in Social Security cases."  *Id.*  To satisfy the "clear and convincing reasons"

3  requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is

4  not credible and what evidence undermines the claimant's complaints."  *Brown-Hunter v. Colvin*,

5  806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

6  In weighing the claimant's credibility, the ALJ may consider many factors, including

7  "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior

8  inconsistent statements concerning the symptoms, and other testimony by the claimant that

9  appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to

10  follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v.*

11  *Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th

12  Cir. 1996)).  The ALJ's reasons must be supported by substantial evidence in the record.  *Thomas*

13  *v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

14  ### 1.    The ALJ Did Not Find Malingering

15  Here, the ALJ found that E.G.'s "medically determinable impairments could reasonably be

16  expected to cause the alleged symptoms," AR at 24, 30, thus requiring either a finding of

17  malingering or clear and convincing reasons to reject her testimony, *Trevizo*, 871 F.3d at 678.[4]

18  Contrary to the Commissioner's present arguments, the ALJ did not specifically find that E.G. was

19  malingering.  "Malingering means fabricating or exaggerating symptoms of any mental or

20  physical disorders for personal gain."  *Webber v. Berryhill*, No. 2:15-cv-00295-MKD, 2017 WL

21  722593, at *6 n.6 (E.D. Wash. Feb. 23, 2017) (citing a National Institutes of Health website).

22  That E.G. at one point expressed an intent to focus her application on physical impairments does

23  not show that she deliberately fabricated or exaggerated her symptoms for gain, and the ALJ made

24  no such finding.  The ALJ appears to have concluded only that because E.G. did not always

25  believe that her mental limitations would support a strong claim for disability, her mental

26

27  _____

28  [4] The Commissioner notes a longstanding objection to the "clear and convincing" standard in this context, but does not dispute that this Court is bound by that Ninth Circuit precedent.  ECF No. 14 at 6 n.2.

1    limitations were likely not particularly severe.  *See* AR at 24 ("The fact that she has indicated her

2    claim is stronger based on physical reasons diminishes the consistency of the claimant's

3    allegations of debilitating mental limitations.").  Where, as here, an "ALJ made no finding that [a

4    claimant] was malingering, [the ALJ] was required to give clear and convincing reasons in support

5    of [an] adverse credibility finding."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir.

6    2006).[5]

7         The ALJ was therefore required to identify clear and convincing reasons to reject specific

8    testimony.  The ALJ erred in two ways.

9              **2.    The ALJ Failed to Identify Specific Testimony as Not Credible**

10        Rather than "identify[ing] what testimony is not credible" as required by *Brown-Hunter*,

11   806 F.3d at 493, the ALJ merely asserted that E.G.'s "statements concerning the intensity,

12   persistence and limiting effects of these symptoms are not entirely consistent with the medical

13   evidence and other evidence in the record," AR at 24, and thus "cannot be wholly accepted," AR

14   at 30.  It is not clear what testimony the ALJ credited or rejected.

15        For example, E.G. testified that she relies on her husband to finish household tasks like

16   cleaning for her, because she abandons them partway through and goes to bed.  AR at 51.  That

17   testimony is in tension with the ALJ's assessment that E.G. retains the capacity to work "in a task

18   oriented environment."  AR at 23.  But the ALJ's failure to specify whether she found E.G.'s

19   testimony on the subject credible leaves the Court to guess whether the ALJ rejected that

20   testimony, and if so, what reasons she relied on to do so.  Another possibility is that the ALJ

21   credited that testimony, such that it was not among the statements that she believed to be "not

22   entirely consistent with the medical evidence," but (for reasons that are not obvious) the ALJ

23   found it consistent with the RFC she assessed.  This sort of ambiguous posture is neither

24   _____

25   [5] Some other Ninth Circuit decisions have noted, without resolving, potential tension between
     *Robinson*'s requirement of an affirmative *finding* of malingering and other precedent that
26   discusses this issue in terms of whether there was *evidence* of malingering.  *See Ghanim v. Colvin*,
     763 F.3d 1154, 1163 n.9 (9th Cir. 2014).  *Robbins* is binding on this Court.  In any event, the
27   Court is not persuaded that merely discussing a strategy for which impairments to highlight in an
     application for disability benefits is evidence of malingering.  Notably, Dr. Correa found no
28   indication of malingering based on E.G.'s performance on the Test of Memory Malingering, AR at
     379, and the ALJ did not address that result or find it less than credible.

conducive to meaningful review nor consistent with binding precedent requiring ALJs to identify which portions of claimants' testimony they find not credible and clear and convincing reasons for doing so.

Either possible ruling—that the ALJ found E.G.'s testimony regarding her inability to finish tasks not credible, or that the ALJ credited it and accounted for it in her RFC—*might* find sufficient evidence in the record to affirm if the ALJ had explained her reasoning.  But affirming the outcome where the ALJ failed to make clear which path she took to get there would violate the rule that the Court can "review only the reasons provided by the ALJ" and "may not affirm the ALJ on a ground upon which [s]he did not rely."  *Garrison*, 759 F.3d at 1010.[6]  At least under the circumstances of this case, the ALJ's "[g]eneral findings" regarding E.G.'s testimony "are insufficient" to permit review consistent with Ninth Circuit precedent, *see Brown-Hunter*, 806 F.3d at 493, and that deficiency alone warrants remand.  *See also Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (reversing where "the ALJ did not elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony").

### 3.    The ALJ Did Not Provide Clear and Convincing Reasons Supported by Substantial Evidence to Reject Testimony

Even if the ALJ were not required to identify which testimony she declined to credit, she did not support with substantial evidence at least some of the reasons she provided for finding that unspecified portions of E.G.'s testimony "cannot be wholly accepted."  AR at 30.  Other aspects of the ALJ's reasoning, to the extent supported by evidence, are not clear and convincing reasons to reject E.G.'s testimony.

One example of this oversight in reasoning is potentially relevant to the testimony discussed above regarding E.G.'s professed inability to finish tasks.  The ALJ asserted that E.G.

---

[6] The same principle bars some of the arguments that the Commissioner now offers in his brief but which the ALJ did not cite in her decision, like that it is "unclear how helpful" E.G.'s husband and older son "are during the majority of the day" when they are at work.  ECF No. 14 at 9.  The Ninth Circuit's "decisions make clear that [courts] may not take a general finding—[like] an unspecified conflict between Claimant's testimony about daily activities and her reports to doctors—and comb the administrative record to find specific conflicts."  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  "gets up every day at about 5:30 am to help her husband prepare to go to work," and based on the

2  ALJ's view that the "daily activity of getting up early on a schedule is the same that is necessary

3  for maintaining employment," the ALJ concluded that her "ability to meet this schedule somewhat

4  diminishes the consistency of the claimant's allegations of functional limitations."  AR at 24.

5      The exhibit that the ALJ cites for that premise is a third-party function report from E.G.'s

6  sister-in-law, which includes the following two responses addressing E.G.'s morning routine:

> 9. Describe what the disabled person does from the time he/she wakes
> up until going to bed.
>
> I know they wake up at 5:30am, so my brother can go to work. I
> usually call her in the morning around 9:10am to check up on her. I
> have to remind her that she needs to clean the house. Also, she needs
> to make sure disabled son has taken his medication. I also talk to her
> around 1pm every day to check when my brother gets home. They
> cook together.
>
> . . .
>
> 14. Do the illnesses, injuries, or conditions affect his/her sleep?
> ☑ Yes  ☐ No
>
> I do believe her sleep has changed. Most of the time, she wakes up
> late. I know she gets up early when my brother goes to work, but right
> after he leaves, she goes back to bed. She was more active before.

17  AR at 293.  That third-party function report does not indicate that E.G. "help[s] her husband

18  prepare to go to work" as the ALJ asserted, rather than merely waking up when he wakes up.  *Cf.*

19  AR at 24.  There is no indication in the report regarding the amount of time E.G. is awake or what

20  if any activity she engages in at that point in the day.

21      Yet, the ALJ went on to "[p]resume[]" that E.G. helps her husband prepare his lunch in the

22  morning, because her sister-in-law elsewhere "reported the claimant helps her husband prepare his

23  lunch for the next day during the night before."  AR at 30; *see* AR at 294 ("I know most of the

24  time they cook together.  She won't do it by herself.  So, my brother and her cook[] at night for his

25  lunch.").  It is *conceivable* that someone might help their spouse with his lunch both the night

26  before he goes to work and in the morning before he leaves for work, but one does not follow

27  logically from the other.  (Nor is there evidence in the record that E.G.'s husband routinely brings

28  elaborate lunches to work that would require preparation over the course of two days.)   Moreover,

16

1    to the extent that the ALJ credited E.G.'s sister-in-law's report that E.G. helps her husband cook

2    lunch in evenings, that report indicated that E.G. was unable to do so independently.  AR at 294.

3            E.G.'s own function reports, which the ALJ did not cite for this purpose, similarly indicate

4    that she "get[s] up at 5:30 with her husband every day he goes to work" and then "go[es] back to

5    sleep" before making breakfast for her disabled son later in the morning.  AR at 326 (May 18,

6    2022 report); *see id.* at 304 (similar statement in a May 31, 2021 report).  Like her sister-in-law's

7    report, E.G.'s reports do not indicate that she helps her husband prepare for work in the mornings.

8    Moreover, in describing her symptoms of depression at the administrative hearing, E.G. testified

9    that she often needs her husband's encouragement to get out of bed:

10            A   Oh, I do a lot of crying and I get very -- like if I have to talk about
                -- anything about my brother I get very emotional and sometimes I
11           don't want to get out of bed. I mean, thank goodness for my husband.
                He helps guide me out if -- getting out of bed and going on and doing
12           things.

13            Q   How many -- does he do that every day or every – how often would
                he have to --
14
              A   Quite a few -- probably every day.
15

16    AR at 51.  The ALJ did not address that testimony or specifically determine that it was not

17    credible.

18            The record therefore does not include substantial evidence to support the ALJ's assertion

19    that E.G. wakes up early every morning to help her husband prepare for work.  Even if it did, the

20    ALJ does not explain how such a routine would be "the same that is necessary for maintaining

21    employment," AR at 24, or present clear and convincing reasons why that routine conflicts with

22    any particular testimony.  Waking up in the morning is of course one step towards going to work,

23    but it does not itself demonstrate an ability to perform work—particularly where E.G. went back

24    to sleep each day after waking up with her husband, and testified that she often relied on her

25    husband to get her out of bed.  Even accepting the Commissioner's interpretation that the ALJ

26    "simply pointed out that if Plaintiff consistently got up with her husband daily, she could get up

27    for work," ECF No. 14 at 9, getting up in the morning with her husband would not help E.G.

28    perform a job if she also consistently went back to bed.  After one awakes in the morning, there

United States District Court
Northern District of California

are any number of tasks that one may take on.  While it is possible that those activities may demonstrate the capacity to perform work, there is an absence of evidence regarding what E.G. did once she woke up at 5:30, and that which does exist suggests that she was not industrious and that she was highly reliant on her husband.  The evidence regarding E.G.'s daily first wake-up time therefore does not support a clear and convincing reason to discredit any particular portion of E.G.'s testimony, either standing alone or in conjunction with other evidence that the ALJ identified.

E.G.'s report that she prepared her disabled son's breakfast and reminded him to take his medication when she woke up for the second time later in the morning potentially shows some level of capacity.  *See* AR at 326.  But the ALJ neither cited *that* portion of E.G.'s morning routine as discrediting her testimony nor identified any particular testimony that it contradicted.  *See* AR at 24.  The Court "may not affirm the ALJ on a ground upon which [s]he did not rely."  *Garrison*, 759 F.3d at 1010.  It is also not clear what degree of effort or initiative E.G.'s son's breakfast required, nor the extent to which she relied on reminders from others like her sister-in-law, who indicated that she usually called her in the morning and reminded her about her son's medication. AR at 293.  The fact that E.G. completed at least some basic tasks as part of a later morning routine does not render the ALJ's reliance on her 5:30 schedule a clear and convincing reason to discredit her testimony.

The ALJ also cited E.G.'s statement to a doctor that she wished to pursue her disability application based on physical rather than mental impairments.  AR at 24.  The note at issue, by a family medicine doctor conducting a physical examination on August 26, 2022, reads in relevant part as follows:

> She is under psych care for her depression issue. She does not want to get Social Security disability due to psych related reasons instead wants to pursue more medical and physical issues to be the cause of her disability.

AR at 887.

The note does not specifically state that either E.G. or her doctor believed her mental impairments were not severe.  There are any number of reasons why a claimant might wish to

United States District Court
Northern District of California

1    focus on some impairments rather than others in an application for disability benefits. Perhaps

2    E.G. considered her mental impairments sensitive or embarrassing, and did not wish to discuss

3    them further. Perhaps she thought her physical impairments would be easier to present and

4    understand. Or perhaps, as her counsel now suggests in briefing, she was discouraged by the

5    initial administrative denial of her application (which had cited mental impairments) and did not

6    understand that it would be subject to de novo review by an ALJ. The record does not indicate

7    why E.G. made that comment to her doctor, and the ALJ did not ask her about it at the hearing.

8    Without more, the Court does not find that statement to meet the "demanding" standard of a clear

9    and convincing reason to discredit E.G.'s symptom testimony, *see Trevizo*, 871 F.3d at 678—

10   particularly where the ALJ did not identify any particular testimony as in conflict with it.

11          The ALJ further noted E.G.'s receipt of unemployment benefits for two quarters in 2021.

12   AR at 24. The ALJ acknowledged E.G.'s testimony that she did not believe she was able to work

13   when she applied for unemployment benefits, but concluded that "[t]he allegation that she is not

14   able to work and filing for unemployment, which involves certifying that one is ready, willing,

15   and able to work, is not consistent with her allegation that she is physically and mentally unable to

16   work." *Id.* Setting aside the confusing and potentially contradictory structure of that sentence,[7]

17   the ALJ did not explain why E.G.'s apparent representation in her application for unemployment

18   benefits that she was able to work was more credible than her assertion here that she was not, and

19   that she did not believe she was at the time she submitted that application.

20          As the Commissioner correctly notes, the Ninth Circuit has acknowledged that "receipt of

21   unemployment benefits can undermine a claimant's alleged inability to work fulltime." *Carmickle*

22   *v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161–62 (9th Cir. 2008). But it is not dispositive.

23   In *Carmickle*, for example, the Ninth Circuit held that the claimant's receipt of unemployment

24   benefits did not provide substantial evidence to support an adverse credibility finding where the

25   record did not indicate whether he "held himself out as available for full-time or part-time work."

26   *Id.* at 1162. The same is true here. Nor does the record address the special rules set by the State

27

28   ———————————
     [7] "The allegation that she is not able to work . . . is not consistent with her allegation that she is physically and mentally unable to work." AR at 24.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  of California for unemployment benefits during the COVID-19 pandemic, as discussed in E.G.'s

2  briefs.  ECF No. 10 at 9–10.  Those rules allowed for disability benefits under at least some

3  circumstances where an individual was unable to work for reasons related to the pandemic.  *See*

4  Cal. Lab. & Workforce Dev. Agency, Pandemic Unemployment Assistance (PUA) Program,

5  archived at https://web.archive.org/web/20231002115808/https://www.labor.ca.gov/pandemic-

6  unemployment-assistance-pua-program/.  E.G. might reasonably have believed that her mental

7  impairments stemming from her brother's death during the pandemic, when she was unable to be

8  with him at the hospital, qualified as sufficiently related to COVID-19.

9       Moreover, holding oneself out as available to work does not establish that one is in fact

10  able to work.  As another decision from this district has explained:

11           The Court does not find that Castillo's representation that he was
12           seeking work and capable of work creates serious doubt as to his
              disability here, particularly given that the Commissioner's own
13           regulations and rulings explicitly provide that *actually seeking and
              obtaining work* does not preclude a finding of disability unless the
14           applicant was able to perform at a satisfactory level and retain the
              position. *See* 20 C.F.R. § 404.1574(c) (discussing criteria for
15           evaluating unsuccessful work attempts, where a claimant obtains a
              job but is not able to retain it for an extended period); SSR 05-02
16           (same). Virtually any unsuccessful work attempt will have arisen
              from a claimant presenting himself or herself as ready and willing to
17           work. If such representations do not preclude a finding of disability
              in that context, the Court finds no reason to treat the same
18           representations differently in the context of a claimant seeking
              unemployment benefits. Although a policy argument could perhaps
19           be made against allowing claimants to receive disability benefits for
              periods when they also actually received unemployment benefits, . . .
20           the Commissioner has not identified any authority for such a rule. . . .
              [I]t is not the role of this Court to create policy from whole cloth.

21  *Castillo v. Colvin*, No. 14-cv-03140-JCS, 2016 WL 1559692, at *5 (N.D. Cal. Apr. 18, 2016)

22  (some emphasis omitted).

23       The posture of that decision differed somewhat from this case.  For example, that court

24  was addressing a post-judgment motion for reconsideration, and the ALJ had not specifically

25  identified unemployment benefits as a reason for an adverse credibility finding.  This Court

26  nevertheless finds persuasive the general principle that presenting oneself as eligible for

27  unemployment benefits is not materially different from attempting actual work, which does not

28  preclude a finding of disability.  At least under the circumstances of this case, where the ALJ did

1    not identify any specific symptom testimony as in conflict with E.G.'s previous receipt of

2    unemployment benefits, the Court does not find this to be a clear and convincing reason for an

3    adverse credibility finding.

4          Even where *some* of an ALJ's reasons for discounting a claimant's testimony are not

5    supported by substantial evidence, the decision can be affirmed if the ALJ also offered other valid

6    reasons sufficient to meet the clear-and-convincing standard. *Carmickle*, 533 F.3d at 1162.

7    "[T]he relevant inquiry in this context is not whether the ALJ would have made a different

8    decision absent any error, . . . it is whether the ALJ's decision remains legally valid, despite such

9    error." *Id.* But as discussed in the previous section above, although the ALJ offered other reasons

10   supporting her overall determination of E.G.'s RFC and non-disability, she did not offer specific

11   reasons to discount specific portions of E.G.'s testimony. *See Brown-Hunter*, 806 F.3d at 493;

12   *Burrell*, 775 F.3d at 1138. The Court cannot proceed to the harmless error analysis of whether

13   other reasons for rejecting portions of E.G.'s testimony were legally sufficient when the ALJ did

14   not provide such reasons with the specificity required by Ninth Circuit precedent.

15        **B.      The Court Does Not Reach E.G.'s Remaining Arguments**

16         Because the ALJ's errors in assessing E.G.'s testimony require reversal and remand for

17   further administrative proceedings, the Court need not reach E.G.'s remaining arguments

18   regarding the ALJ's treatment of Dr. Correa's opinions and the ALJ's use of the phrase

19   "production pace" in E.G.'s RFC. E.G. does not seek a judicial determination of disability, so any

20   further error in those aspects for the ALJ's decision would not alter the outcome of this case—that

21   further proceedings are necessary. The Court nevertheless briefly notes two concerns that might

22   benefit particularly from further consideration on remand.

23         First, as E.G. notes, the ALJ relied in part on E.G.'s reports of good grades in high school

24   to reject Dr. Correa's assessment of significant cognitive limitations, but the ALJ did not address

25   in that context E.G.'s need for special education classes. AR at 27–28. The ALJ also did not

26   explain why E.G.'s reportedly successful performance in high school undermined the results of

27   cognitive testing several decades later. Moreover, to the extent the ALJ found Dr. Correa's report

28   ambiguous as to whether she was describing typical impairments caused by low intelligence or

21

1    E.G.'s actual limitations, any such ambiguity presumably could be resolved through supplemental

2    evidence from Dr. Correa.  *See, e.g.*, *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003)

3    (discussing the ALJ's duty to develop the record).  The Court recognizes that the record contains

4    conflicting assessments of E.G.'s mental impairments from multiple examining doctors, and that

5    the record as a whole *might* support the ALJ's decision to credit other opinions of less severe

6    limitations over Dr. Correa's opinions.  But when remand is already necessary to address errors in

7    the ALJ's consideration of E.G.'s testimony, the Commissioner is also encouraged to consider

8    E.G.'s arguments regarding the ALJ's treatment of Dr. Correa's opinions.

9        Second, though the VE did not express any confusion regarding the RFC that the ALJ

10   assessed, and E.G. and her representative did not raise any concerns about ambiguity at the time,

11   the ALJ's reference to "a task oriented environment that does not require a specific production

12   pace" could raise legitimate questions of what constitutes a "specific production pace," as

13   compared to other forms of "task oriented" jobs.  *See* AR at 24.  This Court need not and does not

14   decide whether Fourth Circuit decisions finding similar language impermissibly ambiguous are

15   persuasive and correct.  *See Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (holding that

16   the terms "production rate" and "demand pace" were "not common enough for us to know what

17   they mean without elaboration"); *Perry v. Berryhill*, 765 F. App'x 869, 870 (4th Cir. 2019)

18   (reversing because the phrase "non-production oriented work setting" . . . has no established

19   regulatory definition, and the [ALJ] did not explain it").  If E.G.'s RFC remains the same after

20   further consideration of her testimony and any other issues on remand, however, the

21   Commissioner is encouraged to elaborate on the distinction between a "task oriented" job and a

22   "specific production pace," and to address more specifically whether the jobs the VE identified

23   lack the sort of "production pace" that the ALJ found E.G. unable to meet.

24       These issues are not intended to be exclusive, and the Commissioner is encouraged to

25   consider any other arguments that E.G. might raise on remand.

26   **V.    CONCLUSION**

27       For the reasons discussed above, the Court REVERSES the Commissioner's decision

28   finding E.G. not disabled and denying her application for benefits, and REMANDS the matter for

United States District Court
Northern District of California

further administrative proceedings consistent with this Order.  The Clerk shall enter judgment in favor of E.G. and close the case.

**IT IS SO ORDERED.**

Dated: September 29, 2025

_____
LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California